UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARGARET PISTON,

                Plaintiff,

        v.

COUNTY OF MONROE, et al.,

              Defendants.
_____

<u>DECISION & ORDER</u>

08-CV-6435P

## <u>PRELIMINARY STATEMENT</u>

        Plaintiff Margaret Piston ("Piston") has sued Monroe County and her former

supervisor Mary Quinlivan ("Quinlivan") under Title VII, 42 U.S.C. §§ 2000e *et seq.*, the New

York State Human Rights Law ("NYHRL"), N.Y. Exec. L. §§ 296 *et seq.*, and the Equal

Protection Clause for same-sex discrimination during her employment. (Docket # 14).

Specifically, Piston contends that Quinlivan created a hostile work environment by verbally

abusing her, requiring her to work longer hours than her male coworkers and denying her training

opportunities. Piston further alleges that she was laid off and rejected for re-employment in

retaliation for complaining about the discrimination.

        Piston's complaint asserts the following claims: Title VII claims against Monroe

County for disparate treatment, hostile work environment and retaliation; NYHRL claims against

Quinlivan as an aider and abettor for discrimination and retaliation;[1] a Section 1983 claim against

the County for discrimination based on the Equal Protection Clause; a Section 1983 claim against

---

[1] Piston agreed to withdraw her second and fourth causes of action for hostile environment and retaliation
against Monroe County brought under the NYHRL. (Docket # 43-1 at 3).

the County and Quinlivan for retaliation based on the First Amendment; and, a claim for punitive

damages against Quinlivan.[2]   (Docket # 14 at ¶¶ 42-58, 59-66, 67-72 , 73-77, 78-80).

Currently pending before the Court is defendants' motion for summary judgment.[3]

(Docket # 41).  For the reasons discussed below, defendants' motion is granted in part and denied

in part.[4]


## FACTUAL BACKGROUND

## I.  Overview of IS Department, SAP Project and Employees

Piston worked for Monroe County in the Information Services Department (the

"IS Department") for over twenty-seven years, from October 14, 1980 until the date of her

termination, December 14, 2007.  (Docket # 43 at ¶ 7).  In 1980, Piston began as a Computer

Operator; at the time she was terminated, Piston's title was Programmer Analyst II.  (*Id*. at ¶ 8).

According to Piston, during her tenure with the County, she consistently received satisfactory or

above-average performance reviews.  (Docket # 43-5 at ¶ 4; Piston Dep.[5] at 95).

---

[2]   Defendants argue that Piston's Title VII claims against Quinlivan are barred because her EEOC filings did not name Quinlivan.  (Docket # 41-3 at 1-2).  Piston responds that she has not asserted a Title VII claim against Quinlivan.  (Docket # 43-1 at 4).  Thus, insofar as Piston's complaint may be read to assert a claim under Title VII against Quinlivan, the claim is deemed withdrawn.

[3]   On August 16, 2011, defendants moved to dismiss the complaint under Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket # 31).  After a conference with this Court, defendants agreed that a motion for summary judgment was more appropriate because fact discovery had been completed.  (Docket # 40).  Accordingly, on December 13, 2011, defendants filed the instant motion for summary judgment and, on December 20, 2011, withdrew their earlier motion to dismiss.  (Docket ## 41, 42).  The pending motion, however, still challenges certain of Piston's claims based on the adequacy of the pleadings, rather than on the evidence adduced during discovery. (*See* Docket # 41).  Accordingly, as appropriate, this Court assesses plaintiff's claims under both standards.

[4]   Pursuant to 28 U.S.C. § 636(c), the parties have consented to have a United States magistrate judge conduct all further proceedings in this case, including the entry of final judgment.  (Docket # 8).

[5]   The transcript of Piston's deposition shall be referred to throughout as "Piston Dep. at __."  (Docket # 41-2, Ex. D).

Quinlivan worked as the IS Department's Computer Project Coordinator and supervised Piston from October 1998 until January 2007. (Docket # 43 at ¶¶ 13, 15). During the relevant time period, Quinlivan supervised a programming group consisting of six male employees and Piston. (*Id*. at ¶ 17; Quinlivan Dep.[6] at 33-34). The six males were: Bob Shaw, Bill Monnate, Chuck Palmiere, Joe Arena, Kelvin Connor and Selva Gnaneswara. (Quinlivan Dep. at 33-34). Of that group, Connor was the only other Programmer Analyst II. (Rivera Dep.[7] at 21-22).

The IS Department was responsible for providing technology, computer hardware and software support and project management services to all County departments. (Docket # 43 at ¶ 1). Part of the IS Department's responsibilities included the implementation of computer, telephone and network systems. (*Id*. at ¶ 2). In January 2004, Nelson Rivera ("Rivera") was appointed Director of the IS Department, and, in that capacity, supervised approximately fifty employees. (*Id*. at ¶¶ 18-20). Quinlivan reported to Dave Wirley ("Wirley") until September 2007, when Barbara Frisina ("Frisina") became Quinlivan's supervising manager. (*Id*. at ¶¶ 11-12; Quinlivan Dep. at 40).

In early 2005, the IS Department was involved in a project to implement a new software system known as "SAP." (Docket # 43 at ¶¶ 3-5). The new system became operational for the Finance and Purchasing Department on January 3, 2006, and for the Payroll and Human Resources Department in June 2006. (*Id*. at ¶ 4; Quinlivan Dep. at 61-62; Rivera Dep. at 33).

---

[6] The transcript of Quinlivan's deposition shall be referred to throughout as "Quinlivan Dep. at __." (Docket # 41-2, Ex. E).

[7] The transcript of Nelson Rivera's deposition shall be referred to throughout as "Rivera Dep. at __." (Docket # 41-2, Ex. G).

Piston was responsible for the security of the new system, which required her to perform some of the final tasks before the system became operational.  (Docket # 43 at ¶ 10).

## II.  Allegations of Discriminatory Treatment

According to Piston, Quinlivan treated her differently than her male coworkers by constantly subjecting her to verbal abuse, requiring her to work longer hours and favoring male employees over her for training opportunities.  (Docket # 43-5 at ¶ 5).

### A.  Verbal Abuse

Piston claims that in January 2006 Quinlivan began to berate, criticize and scream at her during department meetings.  (*Id.* at ¶ 9).  According to Piston, Quinlivan did not treat the male employees in her group in the same manner.  (*Id.* at ¶¶ 10-11).  Piston alleges that in March 2006 she asked Quinlivan why she was treating her differently than her male coworkers, and Quinlivan denied that she was treating Piston differently and "agreed not to speak to Piston at future meetings."  (*Id.* at ¶¶ 12-13; Piston Dep. at 27).

That same month, Piston complained about Quinlivan's harassment to Wirley, Quinlivan's supervisor, who responded that he had also "had problems" with Quinlivan and agreed to speak to her.  (Docket # 43-5 at ¶¶ 16-17).  According to Piston, Wirley took no action, however, and Quinlivan's harassment "intensified."  (*Id.* at ¶¶ 18-19).  In March 2006, Piston also complained about Quinlivan's treatment to the County's Employee Assistance Program ("EAP").  (*Id.* at ¶ 24).  EAP recommended that Piston speak with Rivera.[8]  (*Id.* at ¶ 25).

---

[8]  No evidence in the record exists to establish that Piston followed EAP's recommendation to speak to Rivera.

4

According to Piston, after she complained to EAP, Quinlivan's treatment again worsened.  (*Id*. at ¶¶ 27, 29).  Piston affirms that in June 2006 Quinlivan called her a "bitch" in front of Wirley and Frisina, who did nothing in response.  (*Id*. at ¶ 20; Piston Dep. at 31).  Piston further states that on June 9 and 29, 2006, Quinlivan screamed at her in front of her male colleagues.  (Docket # 43-5 at ¶¶ 21, 28).

Piston claims that after the June incidents, Quinlivan subjected her to "screaming rants on a daily basis."  (*Id*. at ¶ 34).  In addition, Quinlivan allegedly told Piston's coworkers to "stay away" from her and in February 2007 admonished one of Piston's coworkers, "while pounding on her desk with her fists," not to email Piston or ask her for assistance.  (*Id*. at ¶¶ 35-36; Piston Dep. at 49).

Piston described one meeting in which Quinlivan became so "highly agitated" with her that Rivera advised her to leave the meeting, noting that Quinlivan was "very excitable." (Piston Dep. at 60).  On another occasion, Quinlivan allegedly screamed at Piston and told her to stop working on a particular task, only to call her at home later and instruct her to complete that same task.  (*Id*. at 60-61).  By contrast, Rivera testified that he did not recall any instances in which supervisors raised their voices at Piston.  (Rivera Dep. at 50).

In addition, Piston testified that Quinlivan once commented on Piston's brassiere in front of her male coworkers during a meeting.  (Piston Dep. at 67).  According to Piston, Quinlivan's conduct of commenting "in front of a bunch of males . . . about [her] undergarments was humiliating."  (*Id*. at 68).

On January 11, 2007, Piston complained about Quinlivan's treatment of her to Ronald House ("House"), an employee in the County's Affirmative Action department.[9]  (Docket ## 43-5 at ¶ 37; 43, Appendix II, Exs. C, D).  House testified that Piston complained that Quinlivan was rude to her, yelled at her in a condescending manner and treated her differently than her male coworkers.  (House Dep.[10] at 62; Docket # 43, Appendix II, Exs. C & D).  House concluded that the problems stemmed from a personality conflict, rather than from discrimination.  (House Dep. at 63).

As a result of Piston's complaint to House, a meeting was arranged between Rivera and Piston.[11]  (*Id*. at 65).  After that meeting, Rivera advised House that he and Piston agreed that she would be reassigned to a different supervisor.  (*Id*. at 66).  House testified that he confirmed with Piston that she was "amenable" to the reassignment.  (*Id*.).  In March 2007, Wirley thereafter replaced Quinlivan as the supervisor for Piston's group.  (Docket # 43-5 at ¶ 41; House Dep. at 67; Quinlivan Dep. at 78; Piston Dep. at 53).

After the reassignment, Piston and Quinlivan still attended some of the same meetings.  (Docket # 43-5 at ¶ 42; Piston Dep. at 54; Quinlivan Dep. at 79).  According to Piston, Quinlivan continued to "mercilessly verbally berate[]" her.  (Docket # 43-5 at ¶ 44).

Quinlivan testified that she and Piston had "a very good working relationship" and often ate lunch together.  (Quinlivan Dep. at 44).  Quinlivan recalled that on one occasion in

---

[9]  According to Piston, she met with House in February 2007.  (Docket # 43-5 at ¶ 37).  House's contemporaneous notes reflect that the meeting occurred on January 11, 2007.  (Docket # 43, Appendix II, Exs. C, D).

[10]  The transcript of House's deposition shall be referred to throughout as "House Dep. at __."  (Docket # 43, Appendix I, Ex. E).

[11]  Rivera recalled meeting with both Piston and House.  (Rivera Dep. at 40-41).

2001 she spoke to Piston about inappropriate work behavior, but never formally disciplined her. (*Id*. at 45-46, 77).  Quinlivan denied yelling at her or otherwise berating her.  (*Id*. at 82). According to Quinlivan, Piston stopped speaking to her in approximately January 2007.  (*Id*. at 79-80).

### B. **Longer Hours**

According to Piston, Quinlivan required her to work longer hours than her male coworkers.  Piston identifies two occasions preceding the implementation of the SAP system in January 2006 on which she worked later than her male counterparts.  One occurred in December 2005, when Quinlivan required her to work until 10:00 p.m., but allowed two male coworkers with similar responsibilities for system security – Joe Arena and Praveen Kumar – to leave at 5:00 p.m.  (Docket # 43-5 at ¶ 7; Piston Dep. at 12-15).

The second occasion occurred on January 2, 2006, when she was required to work a twenty-three hour day.  (Docket # 43-5 at ¶ 8).  According to Piston, she was ordered to return to work that day, but the male employees were allowed to leave between 4:00 and 5:00 p.m. and not directed to return.  (*Id*.).  Quinlivan testified that on that day Rivera telephoned her at approximately 6:15 p.m. and ordered that both she and Piston return to the office.  (Quinlivan Dep. at 50-52).  According to Quinlivan, she left at approximately 1:00 a.m. and believes that Piston stayed until approximately 4:00 a.m.  (*Id*. at 53-54).

Piston also contends that Quinlivan called her at home on June 9, 2006, her day off, and required her to come to work, but allowed her male coworkers to remain at home. (Docket # 43-5 at ¶¶ 22-23).  Quinlivan testified that she may have asked Piston to work from home, but that she did not recall asking her to return to the office.  (Quinlivan Dep. at 64).

### C. **Less Training**

Piston maintains that in 2007 she was denied Oracle and SAP training that her male colleagues received. (Docket # 43-5 at 5; Piston Dep. at 42, 45-46). Piston further contends that in August 2006 her male coworkers were provided consultants to help them with their work, but she was not. (Piston Dep. at 47).

On July 26, 2007, Piston sent the following email to Frisina, Wirley, and Rivera:

> Why I am not allowed the same SAP education investment as the guys on my team? They are being allowed to attend 3-4 training classes this year and as of yet you have not replied to any of my emails on whether I am allowed to attend even one. I have been requesting training since March both through emails to you and also through the process you set up.

(Docket # 43, Appendix II, Ex. E). That same day, Wirley responded:

> We have a limited budget for [t]ravel required for offsite training. The travel budget has been expended for this year. We have requested travel funding for 2008 that if approved would allow you to take an offsite class next year. [L]earning licenses are being ordered that would allow you to take one of the prerequisites for your requested class.

(*Id*.).

Employee training decisions were made by a committee comprised of various department heads and were based on considerations of needs and budget. (Docket # 43 at ¶¶ 22-23). Frisina, a member of the committee, evaluated employee training requests and made recommendations to the committee. (*Id*. at ¶ 24; Frisina Dep. at 73). Quinlivan assisted Frisina in coordinating the travel associated with the training, but did not recommend who should receive training. (Frisina Dep. at 72; Quinlivan Dep. at 74).

8

Quinlivan testified that all employees received in-house SAP training in 2005, and Piston also attended two week-long training programs in San Francisco and Philadelphia that year.  (Quinlivan Dep. at 72-73).  According to Rivera, the County spent over $30,000 on training expenses for Piston in 2006 and none in 2007.  (Docket # 41, Ex. H).[12]

Frisina testified that in March 2007 Piston requested and was denied permission to attend two training classes.  (Frisina Dep. at 76-77).  According to Frisina, Piston's requests were denied because one course required a prerequisite training course that Piston had not taken and the other course was not relevant to Piston's responsibilities.  (*Id*. at 79, 82).  Frisina further testified that the limited 2007 training budget was used for other training "needs that were more important."  (*Id*. at 98).

According to Rivera, Piston received more training than other employees in 2006 because SAP security issues were critically important at that time.  (Docket # 41, Ex. H at ¶ 13).  In 2007, training expenses were allocated to address other issues that had "come to the forefront."  (*Id*. at ¶ 14).

### D.  **More Work**

Piston also contends that her workload was heavier than that of her male colleagues, and she was sometimes required to perform their work.  (Piston Dep. at 21-22).  She claims that she had responsibility for maintaining multiple servers and applications, but her male coworkers did not.  (*Id*.).  Piston also testified she was once required to cancel her scheduled

---

[12] Defendants have included in their motion a spreadsheet purporting to list the expenses incurred in SAP training for employees in the IS Department during 2006 and 2007.  (Docket # 41, Ex. B).  In 2007, one of her male colleagues attended four trainings at an expense of $10,275.  (*Id*.).  Another attended three trainings at an expense of $7,475.  (*Id*.).  Although the spreadsheet is unaccompanied by an affidavit explaining how it was created and maintained, a review of Frisina's deposition testimony reveals that she prepared it in response to Piston's EEOC complaint.  (Frisina Dep. at 69-72).

vacation in order to cover for two male colleagues while they attended SAP training.  (Piston Dep. at 22-23, 26-27).

### III.   Allegations of Retaliation

#### A.   Elimination of Piston's Position

In October 2007, Piston learned that she was being laid off.  (Docket # 43-5 at ¶¶ 46-50).  Piston was advised that the layoff resulted from budgetary considerations, although Piston had also been told that there was a budgetary surplus.  (*Id*. at ¶ 48; Piston Dep. at 58).  According to Piston, three men in her department were promoted to new positions at the same time that she was laid off.  (Docket # 43-5 at ¶ 46).  Piston alleges that although she had the most seniority, she was selected for layoff because her training was not current – a deficiency that Piston attributes to defendants' discriminatory training decisions.  (*Id*. at ¶¶ 50-51; Piston Dep. at 99).

In 2007, Kelvin Connor, who worked as the other Programmer Analyst II, was promoted to Programmer Analyst I.  (Quinlivan Dep. at 87).  At the time, Connor had worked for the County for less than three years.  (*Id*.).  The County maintains that Piston's position was eliminated due to projected budgetary shortfalls in 2008.  (Docket # 41, Ex. H at ¶¶ 15-17; Rivera Dep. at 52-53).  Rivera and Frisina discussed which IS position could be eliminated and identified Piston's Programmer Analyst II position because Connor had been promoted to Programmer Analyst I and already knew how to perform some of Piston's job responsibilities.  (Docket # 41-11 at ¶¶ 19-20; Frisina Dep. at 111-13; Rivera Dep. at 52).  Frisina testified that Connor was promoted before Piston's position was eliminated.  (Frisina Dep. at 113-14).

Piston testified that Connor told her that during a meeting with Rivera and Frisina, he was assured that his position was safe.  According to Piston, Connor recounted that Rivera had explained that the County could be "creative" in finding ways to eliminate employees.[13] (Docket # 43-5 at ¶ 49; Piston Dep. at 58-59).

Piston further contends that a male employee whose position was also eliminated was transferred into another position, rather than laid off, as she was.  (Docket # 43 at ¶¶ 30-31; Piston Dep. at 56-57).  Rivera testified that in 2007 one male employee's position as a Business Analyst II in the IS Department was eliminated and he successfully applied for a position in the Department of Human Services.[14]  (Rivera Dep. at 24-25, 57).

Quinlivan testified that she had no hiring and firing authority, but only discretion to recommend promotions.  (Quinlivan Dep. at 62, 84).  According to Quinlivan, she had no involvement in the decision to eliminate Piston's position and only learned of it less than an hour before Piston did.  (*Id*. at 84-85).

## B. Conditional Offer

As an alternative to layoff, Piston was offered a lower-paying position as a Programmer Analyst III in the Department of Human Services.  (Docket # 43, Appendix II, Ex. F; Rivera Dep. at 70).  That offer was contingent on Piston's agreement to waive her "preferred list rights" to a Programmer Analyst II position, as well as her rights to bring a grievance under the collective bargaining agreement and to file a legal claim in connection with the decision to

---

[13]  There is no information in the record as to when this alleged meeting occurred.

[14]  Although Piston asserts that two other male employees were promoted at the time she was laid off, Piston has not adduced any evidence about their positions in the IS Department or their subsequent promotions.  (*See* Docket # 43-1 at 22; Piston Dep. at 57).

eliminate her Analyst II position.  (Docket # 43, Appendix II, Ex. F).  Piston declined the offer.

(Docket # 43-5 at ¶ 54).  Her termination was effective on December 14, 2007.  (Piston Dep. at

64).

### C.  Decision Not to Rehire

On December 19, 2007, Piston filed a complaint with the EEOC alleging

same-sex harassment and lack of training.  (Docket ## 43-5 at ¶ 56; 41-4).  In January 2008, she

applied for a position with the County as a Project Coordinator, for which she claims she was

qualified.  (Docket # 43-5 at ¶¶ 57-58; Piston Dep. at 65).  She alleges she was not hired for the

position in retaliation for having filed the EEOC complaint.  (Docket # 43-5 at ¶ 59; Piston Dep.

at 65).

Frisina interviewed Piston for the position in May 2008, but did not hire her.  She

testified that Piston was not qualified for the position because she did not have the requisite

supervisory experience.  (Piston Dep. at 66; Frisina Dep. at 118, 121, 125).  Although Frisina

was aware that Piston had supervised employees for a few years in the 1980s, she felt that

Piston's prior supervisory experience was too stale to be relevant.  (Frisina Dep. at 125-27).

Frisina hired a woman for the position who had more recent supervisory experience.  (*Id*. at

120-21, 123, 125-26).

### DISCUSSION

## I.  NYHRL Claims Against Quinlivan

Defendants argue that Piston's NYHRL claims against Quinlivan must be

dismissed because Piston did not file a notice of intent to file a claim as required under New

York County Law § 52.  (Docket # 41-3 at 1).  Alternatively, defendants argue that Piston cannot

sustain her claims under the NYHRL against Quinlivan as an aider and abettor because she has

withdrawn her claims against the County.  (*Id*. at 21).  The County's latter argument is correct.

Under the NYHRL, an employee who "actually participates in the conduct giving

rise to a discrimination claim" may be held liable as an aider and abettor under Section 296(6).

*Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004); *Tomka v. Seiler Corp.*, 66 F.3d 1295,

1317 (2d Cir. 1995).  An employee may be held liable as an aider and abettor of her own conduct

if the plaintiff first establishes the employer's liability for the discriminating practice.  *Lewis v.

Triborough Bridge and Tunnel Auth.*, 2001 WL 46986, *1 (S.D.N.Y. 2001) ("[p]laintiff must

first establish that [employer] committed a primary violation of the NYHRL by encouraging,

condoning, or approving discriminatory conduct on the part of [alleged aider and abettor]"),

*aff'd*, 31 F. App'x 746 (2d Cir. 2002); *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y.

1999) ("[i]t is the employer's participation in the discriminatory practice which serves as the

predicate for the imposition of liability on others for aiding and abetting") (quoting *Murphy v.

ERA United Realty*, 674 N.Y.S.2d 415, 417 (2d Dep't 1998)).  Here, Piston has withdrawn her

claims against Monroe County under the NYHRL; thus, she cannot establish the necessary

violation of the NYHRL by the County in order to impose aider and abettor liability against

Quinlivan.  *Sanchez-Vazquez v. Rochester City Sch. Dist.*, 2012 WL 2856824, *6 (W.D.N.Y.

2012) (dismissing aiding and abetting claim against supervisor where complaint failed to assert

claim against employer; "[t]herefore there is no one for [plaintiff] to have aided and abetted in

violating NYHRL § 296") (citing *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 213-14

(N.D.N.Y. 2002)); *Rivera v. Prudential Ins. Co. of Am.*, 1996 WL 637555, *13 (N.D.N.Y. 1996)

13

(granting summary judgment where plaintiff failed to establish primary violation of the NYHRL).  Accordingly, Piston's claims against Quinlivan as an aider and abettor must be dismissed.

## II.  Applicable Legal Standards for Remaining Claims

### A.  Rule 12(c)

A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b)(6).  *Graham v. Elmira City Sch. Dist.*, 2011 WL 2837629, *2 (W.D.N.Y. 2011).  To avoid dismissal, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Rather, the complaint "must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."  *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 557-58).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  *Ashcroft v. Iqbal*, 556 U.S. at 679.

### B.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this determination, the court must assess whether there are any

disputed material facts and, in so doing, must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49

(1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir. 1991).  A

fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. at 248; *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.

2000).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also*

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d at 97.

      The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact, after which the non-moving party must come forward with

sufficient evidence to support a jury verdict in its favor; the motion will not be defeated based

upon conjecture, surmise or the existence of "metaphysical doubt" concerning the facts.  *Bryant*

*v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586 (1986)).  The party seeking to avoid summary judgment "must

do more than make broad factual allegations and invoke the appropriate statute.  The [party] must

also show, by affidavits or as otherwise provided in Rule 56 . . . , that there are specific factual

issues that can only be resolved at trial."  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995);

*see also Driscoll v. Townsend*, 60 F. Supp. 2d 78, 80 (W.D.N.Y. 1999).

      As the Second Circuit has explained:

> [T]he trial court's task at the summary judgment motion stage of
> the litigation is carefully limited to discerning whether there are
> any genuine issues of material fact to be tried, not to deciding
> them.  Its duty, in short, is confined at this point to issue-finding; it
> does not extend to issue-resolution . . . .  [I]t must be kept in mind

> that only by reference to the substantive law can it be determined
> whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Thus, on

summary judgment motions, the court should not evaluate "ambiguous acts," make credibility

determinations, weigh the evidence or draw any inferences from the record. *Redd v. New York*

*State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).

As the Second Circuit recently observed, in cases alleging discrimination on the

basis of sex:

> The question of whether considerations of the plaintiff's sex
> caused the conduct at issue often requires an assessment of
> individuals' motivations and state of mind. Issues of causation,
> intent, and motivation are questions of fact. Although summary
> judgment in discrimination cases is fully appropriate, indeed
> mandated, when the evidence is insufficient to support the
> non-moving party's case, when, as is often the case in sexual
> harassment claims, fact questions such as state of mind or intent
> are at issue, summary judgment should be used sparingly.

*Id*. at 178 (internal quotations, citations, brackets and emphasis omitted).

## III.   Title VII Hostile Environment Claim

I turn first to Piston's claim that the County is liable for a hostile work

environment created by Quinlivan.[15]   The County asserts that Piston's complaint fails to plead

adequate facts to support this claim and, in the alternative, that summary judgment should be

granted.  (Docket # 41-3 at 3).

---

[15]  The County may be held liable under Title VII for Quinlivan's actions as a supervisor.  *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)).

16

A. **General Legal Principles**

A hostile work environment based on gender is one form of disparate treatment prohibited by Title VII.  *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001).  "Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is 'abusive.'"  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)).  A hostile work environment claim has "objective and subjective elements," requiring a plaintiff to demonstrate both that she subjectively perceived the environment to be abusive and that the environment was "'objectively hostile and abusive.'"  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21).

Claims of same-sex harassment are cognizable under Title VII's prohibition against discrimination "because of . . . sex."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998).  While the harassing conduct giving rise to a hostile work environment claim "need not be motivated by sexual desire," *id.* at 80, it must "be based on sex," *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 117 (2d Cir. 2010) (internal quotation omitted).  Where, as here, the claim is based upon conduct allegedly motivated by gender-animus rather than sexual desire, it may be proven by:

> harassment in such sex-specific and derogatory terms as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace, or by offering some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.

*Id.* at 117-18 (internal quotations, citations and brackets omitted).  Proof of a hostile work environment may also be based on "direct comparative evidence about how the alleged harasser

treated members of the both sexes in a mixed-sex workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 80-81.

The "critical issue" under Title VII "is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id*. at 80 (internal quotation omitted). *See Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d at 118 (proof of gender-based hostile work environment may consist of evidence that women were subjected to "disparately harsh working conditions"); *Raniola v. Bratton*, 243 F.3d at 621 (proof of hostile work environment included evidence of "disproportionately burdensome work assignments"). Title VII is not intended to be "a general civility code for the American workplace." *Oncale*, 523 U.S. at 80; *see also Wilson v. Family Dollar Stores of N.Y., Inc.*, 2008 WL 4426957, *9 (E.D.N.Y. 2008) (evidence that employee and manager "did not work well with or like each other" insufficient to defeat summary judgment motion on hostile work environment claim), *aff'd*, 374 F. App'x 156 (2d Cir. 2010); *Serrano v. Runyon*, 1997 WL 718976, *3 (D. Conn. 1997) ("[d]iscord based on personality conflicts between co-workers or between a supervisor and an employee is not actionable under Title VII").

## B.  Sufficiency of Complaint

I turn first to the question whether Piston's complaint plausibly alleges a claim of disparate treatment based on a hostile working environment. To plausibly state a claim for a hostile work environment, a plaintiff must allege discriminatory conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment."[16]  *Alfano*, 294 F.3d at 373; *see also Graham v. Elmira City Sch. Dist.*,

2011 WL 2837629 at *3.  "To determine whether the discriminatory conduct is severe and

pervasive, the Court looks at the totality of circumstances and 'such factors as the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a

mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'"  *Graham*, 2011 WL 2837629 at *3 (quoting *Carlson v. Geneva City Sch. Dist.*,

679 F. Supp. 2d 355, 374 (W.D.N.Y. 2010)).  Isolated or episodic incidents "do not meet the

threshold of severity or pervasiveness"; rather, the incidents must be "sufficiently continuous and

concerted."  *Alfano*, 294 F.3d at 374.  "These factors must be evaluated both subjectively and

objectively: a reasonable person would find the environment hostile or abusive and the victim did

in fact perceive it to be so."  *DeWitt v. Lieberman*, 48 F. Supp. 2d at 290 (citing *Harris*, 510 U.S.

at 21-22).

> In this case, the complaint adequately pleads a gender-based hostile work

environment.  Piston alleges that during the period December 2005 through 2007, Quinlivan

yelled at her and verbally berated her in group meetings and did not subject her male colleagues

to the same treatment, and that such verbal harassment intensified into daily "rants" (Docket # 14

at ¶¶ 12, 18, 21, 24, 31); Quinlivan called her a "bitch" in front of another manager and

admonished other employees to "stay away" from her (*id*. at ¶¶ 17, 25-26); her supervisors

required her to work longer hours than her male coworkers (*id*. at ¶¶ 10, 11, 18); her male

colleagues were provided consultants to assist them with their job responsibilities, while she was

---

[16]  A plaintiff alleging a hostile work environment must also provide "a specific basis . . . for imputing the objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d at 373.  Defendants do not dispute that Piston may impute Quinlivan's alleged conduct to the County.

not (*id*. at ¶ 23); and, three of her male coworkers were promoted at the same time that her position was eliminated (*id*. at ¶ 32).

These alleged facts plausibly suggest that Piston was subjected to conduct sufficiently severe and pervasive to constitute a gender-based hostile work environment. *See Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d at 375 (repeated sexual comments over a period of months sufficient to state a plausible claim); *Curtis v. Airborne Freight Corp.*, 1998 WL 883297, *5 (S.D.N.Y.1998) (complaint adequately stated a claim for hostile environment where it alleged seven specific incidents and continuous verbal harassment); *Armstrong v. Chrysler Fin. Corp.*, 1998 WL 342045, *2 (D. Conn. 1998) (plaintiff stated prima facie case for hostile environment where she alleged that she was subjected to verbal harassment, criticism and insults on a daily basis and her supervisor "frequently declared her incompetent and demeaned her professional ability in the presence of others"). *Cf. Sanchez-Vazquez v. Rochester City Sch. Dist.,* 2012 WL 2856824 at *4 ("handful of alleged comments" over four-year period insufficient to state hostile work environment claim); *Graham*, 2011 WL 2837629 at *4 (dismissing hostile work environment claim based upon five offensive comments made outside plaintiff's presence by coworkers during a four-year period).

## C. Issue of Fact for Summary Judgment

Defendants also contend that Piston cannot create a triable issue of fact as to her hostile work environment claim because there is no proof that Quinlivan treated her differently because of her sex.  (Docket # 41-3 at 12-13).  Resolving all disputed factual issues in favor of Piston, as I must, I disagree that the record is devoid of evidence sufficient to withstand summary judgment.

The evidence submitted by Piston in response to defendants' summary judgment motion, consisting of Piston's affidavit and excerpts from her deposition testimony, is sufficient to raise a triable issue of fact on her hostile work environment claim.  Those sworn assertions describe an escalating pattern of verbal harassment by Quinlivan against Piston beginning in December 2005 and culminating in "screaming rants on a daily basis" in the presence of her male coworkers.  (Docket # 43-5 at ¶ 34).  Piston recounted one meeting in which Quinlivan screamed at her in front of Rivera and others, prompting Rivera to urge Piston to "hurry up and get [those files on the network because] Mary [Quinlivan] is being very excitable" and another employee to seek her out after the meeting "to see how I was because of the screaming."  (Piston Dep. at 60). Piston described another meeting in June 2006 in which Quinlivan "scream[ed] at her" that she should not be performing a particular task, but later called her at home and directed her to perform the same task.  (*Id*. at 61).  On another occasion, Quinlivan called her a "bitch" several times in front of Frisina and commented, "something has to be done," while on another, Quinlivan humiliated her by commenting on her brassiere in front of her male colleagues during a meeting.  (*Id*. at 31, 67-68).  According to Piston, these specific incidents were merely examples of the continuous pattern of verbal abuse to which Quinlivan subjected her – the only female employee in her group – but not her male coworkers.[17]  (Docket # 43-5 at ¶¶ 10-11, 28-29).  The striking disparity between the manner in which Piston alleges that Quinlivan treated her compared to her male colleagues, in addition to Quinlivan's occasional use of some gender-specific comments, such as calling Piston a "bitch" and commenting on her brassiere,

---

[17]  Piston described another occasion on which Quinlivan, "while pounding on her desk with her fists," admonished a coworker not to seek assistance from Piston.  (Docket # 43-5 at ¶¶ 35-36; Piston Dep. at 49).

gives rise to an inference that Quinlivan's treatment was based on hostility toward Piston because of her sex. *See Raniola*, 243 F.3d at 622 ("prior derogatory comments by a co-worker may permit an inference that further abusive treatment by the same person was motivated by the same sex-bias manifested in the earlier comments") (citing *Howley v. Town of Stratford*, 217 F.3d 141, 156 (2d Cir. 2000)). *Cf. Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, 2007 WL 1149979, *16 (S.D.N.Y. 2007) ("[plaintiff's] testimony that [harasser] treated some women better than her and that he treated some men badly further undermines [plaintiff's] claim that the alleged mistreatment she received is attributable to discriminatory animus"). Although Quinlivan has denied these allegations, whether they occurred and, if so, whether they occurred because of Piston's gender, hinge on factual determinations, including credibility assessments, that must be made by a jury at trial.

Even if the above-described allegations, standing alone, were insufficient to prove a hostile work environment claim, *see Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, 2007 WL 1149979 at *18 ("using a loud and intimidating voice and slamming furniture, without more, does not create a hostile work environment"), Piston has alleged additional conduct showing that she was singled out for discriminatory treatment. For example, Piston's sworn assertions claim that she was required to work longer hours than her male coworkers on several occasions. Although defendants have proffered deposition testimony suggesting that Piston was required to work longer hours because she was responsible for certain of the last tasks to be completed before implementing the SAP system, Piston has disputed that she was the only employee with those responsibilities. (Piston Dep. at 14). Again, resolution of these factual disputes is inappropriate at this stage.

22

Piston has also alleged that she had a heavier workload than her male colleagues and once was required to cancel her vacation in order to cover for two of her male coworkers while they attended SAP training.  This evidence, if credited, may be considered as part of the totality of the circumstances creating a hostile work environment.  *See Pucino*, 618 F.3d at 118 (proof of gender-based hostile work environment may consist of evidence that women were subjected to "disparately harsh working conditions"); *Raniola*, 243 F.3d at 621 (proof of hostile work environment included evidence of "disproportionately burdensome work assignments").

Finally, Piston's evidence also consists of her sworn assertions that she was denied training opportunities offered to her male colleagues, including working with competent consultants.  (Docket # 43-5 at ¶¶ 32-33; Piston Dep. at 42, 45-46).  *See Gregory v. Daly*, 243 F.3d 687, 693 (2d Cir. 2001) (considering assertion that plaintiff was deprived of "necessary training" in evaluating sufficiency of allegations stating claim for hostile work environment (citing *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 579 (2d Cir. 1989) (denial of adequate training contributed to hostile work environment))); *Perez v. Commc'ns Workers of Am.*, 2005 WL 2149204, *11 (E.D.N.Y. 2005) (plaintiff's claims that he was denied training did not contribute to hostile work environment where plaintiff failed to establish that similarly-situated employees were treated more favorably), *aff'd*, 210 F. App'x 27 (2d Cir. 2006).

As to the subjective element of her claim, the evidence is sufficient to raise a triable issue of fact that Piston viewed the above-described conduct as discriminatory and abusive.  The record demonstrates that she made several complaints about Quinlivan's treatment to supervisors and personnel department officials, including a complaint to Ronald House of the Affirmative Action Section of the County's Human Resources Department.  House himself

testified that she specifically complained about discrimination and disparate treatment by Quinlivan.  (House Dep. at 62).  The record also contains a copy of an email she sent to Rivera, Frisina and Wirley complaining that she was being denied training opportunities that were offered to her male coworkers.  (Docket ## 43-5 at ¶ 33; 43, Appendix II, Ex. E).

                In sum, viewing the totality of the evidence, a reasonable jury could conclude that Piston was subjected to a hostile working environment.  *See Oncale*, 523 U.S. at 80-81; *Raniola*, 243 F.3d at 623 ("[v]iewing the totality of the evidence, we conclude that the question of whether [plaintiff's] treatment was due to her being a woman should not have been decided on a motion for judgment as a matter of law . . . [but] should have been decided by the jury"); *Howley v. Town of Stratford*, 217 F.3d at 154 (plaintiff's evidence sufficient to create triable issue of fact on hostile work environment claim where it consists principally of proof that plaintiff was subjected to lengthy, offensive and obscene tirade by coworker in front of large group that included her subordinates; "[i]t cannot be concluded as a matter of law that no rational juror could view such a tirade as humiliating and resulting in a intolerable alteration of [plaintiff's] working conditions"); *Casolare v. Cnty. of Onondaga*, 2006 WL 1877139, *7 (N.D.N.Y. 2006) (denying motion for summary judgment where plaintiff alleged harassment occurring "on a virtually daily basis").  *Cf. Kaur v. New York City Health and Hosps. Corp.*, 688 F. Supp. 2d 317, 337-38 (S.D.N.Y. 2010) (two derogatory and two ambiguous statements by supervisors and four instances of throwing out plaintiff's food over a period of fourteen years did not create a hostile work environment); *Perez v. Commc'ns Workers of Am.*, 2005 WL 2149204 at *11 (allegations that employee was "constantly . . . yelled at by managers" and not allowed to participate in training, in absence of

evidence of discriminatory animus, were insufficient to create triable issue of fact as to hostile

work environment claim).


IV.  **Title VII Failure to Train & Promote Claim**

I turn next to Piston's claim against the County for disparate treatment for failure

to train and promote her.  (Docket # 14 at ¶ 43).  Evaluation of this claim begins with the familiar

*McDonnell Douglas* burden-shifting framework.  "To establish a prima facie case of

discrimination under *McDonnell Douglas*, a plaintiff must show: (1) she is a member of a

protected group; (2) she was qualified for the position; (3) she experienced an adverse

employment action; and (4) that action occurred under circumstances giving rise to an inference

of discrimination."  *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 109 (2d Cir. 2011).

"Even if a plaintiff sets forth a *prima facie* case, however, this establishes only a rebuttable

presumption of [discrimination], and where the defendant identifies a legitimate,

non-[discriminatory] reason for the adverse employment action, the burden shifts back to the

plaintiff to show that the defendant's articulated reason is a pretext for [discrimination]."  *Id*. at

110.  *See also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).

Here, Piston alleges that the County failed to offer her the same training provided

to her male coworkers, which caused her to be less qualified for promotion than her male

coworkers and led to the elimination of her position.  (Docket # 43-1 at 19-24).  Defendants

appear to dispute only the fourth prong – whether the failure to train Piston occurred under

circumstances giving rise to a inference of discrimination.  (Docket # 41-3 at 3-4).[18]  Defendants

further maintain that even if Piston has adduced sufficient evidence to make out a prima facie

case of discrimination, she has not raised a triable issue of fact that the proffered justification was

pretextual.  (*Id*.).

I disagree.  The record before the Court on this motion demonstrates that in 2007

one of Piston's less-senior male colleagues who held the same position as Piston, Kelvin Connor,

was promoted to Programmer Analyst I.  (Quinlivan Dep. at 87; Rivera Dep. at 66-67; Frisina

Dep. at 113).  Prior to Connor's promotion, Piston had trained him on SAP security issues, one

of her areas of responsibility.  (Frisina Dep. at 112-13).  According to Frisina, who was

responsible for making recommendations to the training committee, she decided that Piston

should "cross train" Connor in order to create an intentional redundancy so that more than one

employee "could do the security configuration."  (*Id*. at 73, 112).  In addition, in 2007, Connor

was approved to attend four training sessions, while Piston was denied permission to attend the

two she had requested, including one for which Connor was approved.  (*Id*. at 75-76, 103-104).

The record is undisputed that in July 2007 Piston complained to Frisina, Rivera and Wirley that

she was being denied training opportunities that were being provided to her male coworkers.

(Docket # 43, Appendix II, Ex. E).  Frisina further testified that she recommended to Rivera the

elimination of Piston's Programmer Analyst II position because Connor had been promoted to

---

[18]  Indeed, as to the third prong – the adverse employment action – "[d]enial of training can constitute an adverse employment action where it 'bear[s] on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.'" *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (internal quotation omitted).  Thus, an employee may establish that denial of training was an adverse employment action where the lack of training led to a material harm, such as the denial of a promotion.  *Id*. *See also Miller v. Ithaca*, 2012 WL 1977974, *5 (N.D.N.Y. 2012); *Hadman v. Sebelius*, 2011 WL 4736972, *5 (E.D.N.Y. 2011).

Programmer Analyst I and had been cross-trained on Piston's duties.  (Frisina Dep. at 111-13;

Rivera Dep. at 52).  On this record, a jury could reasonably infer that the County provided more

training to male employees in order to promote them over female employees.

　　　　　For these reasons, I conclude that Piston has raised triable issues of fact that the

denial of training in 2007 occurred under circumstances giving rise to an inference of

discrimination and that the County's proffered justification – that the limited 2007 training

budget was appropriately spent on training needs more important than Piston's (*see* Docket

# 41-11 at ¶ 14) – is pretextual.  Therefore, I deny the defendants' motion for summary judgment

on this claim.  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 77-78 (2d Cir. 2001) (vacating

district court's grant of summary judgment to defendant on failure to train claim where plaintiff

testified about employer's discriminatory intent); *Nakis v. Potter*, 2004 WL 2903718, *21

(S.D.N.Y. 2004) (denying defendant's motion for summary judgment where plaintiff alleged she

was deprived of training under circumstances giving rise to inference of discrimination).


## V.   Title VII Retaliation Claim

　　　　　"To plausibly state a claim for discriminatory retaliation[,] [p]laintiff must state

facts in support of the following elements: (1) participation in a protected activity; (2) that

[defendant] knew of the protected activity; (3) [defendant] took an adverse employment action

against [p]laintiff; and (4) a causal connection between the protected activity and adverse action."

*Graham*, 2011 WL 2837629 at *4 (citing *Paulino v. N.Y. Printing Pressman's Union, Local

Two*, 301 F. App'x 34, 37 (2d Cir. 2008)).  With respect to the first element, protected activity

includes complaints of unlawful discrimination.  *Foster v. Humane Soc'y of Rochester and*

*Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 394 (W.D.N.Y. 2010).  With respect to the last element, temporal proximity between the protected activity and the adverse employment action may be sufficient to establish a prima facie case of retaliation.  *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext").  However, the temporal proximity must be sufficiently close.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (collecting cases holding that proximity must be "very close").

Piston's complaint asserts a cause of action for retaliation based on two acts: the decision to eliminate her position in 2007 seven months after her complaint to House and the decision not to rehire her for a position for which she applied shortly after she filed a claim with the EEOC in December 2007.  (Docket # 14 at ¶¶ 59-63).  Defendants challenge the adequacy of the pleadings and move for summary judgment as to the first claim of retaliation only.

Taking the layoff claim first, defendants contend that Piston's allegations do not plausibly set forth a retaliation claim because they do not include a claim that Piston's complaint concerned gender discrimination.  (Docket # 41-3 at 11).  In addition, defendants contend that Piston has not alleged any facts suggesting a causal connection between her complaint and the decision to eliminate her position.  (*Id.*).  Defendants further maintain that Piston has failed to raise a triable issue of fact as to either of these elements.

As to the first element – participation in a protected activity – I find that (1) the complaint's allegations are sufficient to plausibly suggest that Piston complained about unlawful

28

discrimination; and (2) Piston's sworn assertions opposing defendants' summary judgment

motion adequately raise a triable issue of fact as to that element.  Not only has Piston affirmed

that she complained to House that Quinlivan was treating her more harshly than her male

coworkers, but House himself testified that he understood that she was complaining about

discrimination and disparate treatment.

With respect to the fourth element, however, I find that Piston has not raised a

triable issue of fact that her layoff was causally connected to her complaint to House seven

months earlier.  Quinlivan testified that she had no involvement in the layoff decision, which

occurred after she had ceased supervising Piston.  (Quinlivan Dep. at 84-85).  Rather, Rivera has

affirmed that he made the decision to eliminate Piston's position with input from Frisina and that

he alone had the authority to hire and fire IS Department employees.  (Docket # 41-11 at

¶¶ 19-21).  Piston has adduced no evidence in admissible format that either Rivera or Frisina

targeted Piston's position for retaliatory reasons.[19]  The simple fact that the layoff decision was

made seven months after Piston complained about discrimination is insufficient, in the absence

of other evidence, to raise a reasonable inference of discrimination, *e.g.*, *Clark Cnty. Sch. Dist. v.

Breeden*, 532 U.S. at 273-74 (twenty-month period insufficient; citing cases holding three and

four month periods insufficient); *Milne v. Navigant Consulting, Inc.*, 2012 WL 3283454, *8

(S.D.N.Y. 2012) (lapse of seven months between complaint and termination insufficient to

support inference of discrimination; "in general within this Circuit, a two- or three-month lapse

---

[19] Piston's affidavit recounts a comment allegedly made by Rivera to one of her male, less senior coworkers that the coworker need not worry that his position would be eliminated because "we can be very creative in getting rid of people we don't want."  (Piston Dep. at 58-59).  This statement is hearsay, and Piston has not shown how she would be able to admit it at trial.  Thus, it must be disregarded on the pending summary judgment motion.  Fed. R. Civ. P. 56(c)(4); *Howley*, 217 F.3d at 155; *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 357 (2d Cir. 1997).

between the protected activity and the adverse employment action suffices to sever any inferred

causal relationship"); *Thompson v. Morris Heights Health Ctr.*, 2012 WL 1145964, *10

(S.D.N.Y. 2012) ("[c]ourts in this Circuit have consistently held that a passage of more than two

months between the protected activity and the adverse employment action does not allow for an

inference of causation" (collecting cases)), let alone to raise a triable issue of fact of pretext.  *See*

*El Sayed v. Hilton Hotels Corp.*, 627 F.3d at 933 (three-week temporal proximity insufficient "to

satisfy [plaintiff's] burden to bring forward some evidence of pretext").  Accordingly, I grant

defendants' motion to dismiss that claim.

       In contrast to the layoff claim, I find that Piston may proceed on her claim for

retaliation based on the County's decision not to rehire her shortly after she filed a discrimination

complaint with the EEOC.  That claim is not addressed in defendants' motion; therefore, its

adequacy is not before the Court.


## VI.  § 1983 Claims

### A.  *Monell* Liability

       Piston has also alleged claims under 42 U.S.C. § 1983 that defendants violated her

right to equal protection under the Fourteenth Amendment and retaliated against her in violation

of the First Amendment.  (Docket # 14 at ¶¶ 67-77).  As an initial matter, defendants move to

dismiss Piston's constitutional claims against the County on the grounds that her complaint fails

to allege facts plausibly suggesting the County's liability.  (Docket # 41-3 at 17).

       To assert a Section 1983 claim against the County, Piston must establish liability

under *Monell v. Dep't of Soc. Svcs. of City of New York*, 436 U.S. 658 (1978).  Specifically, she

must allege that her treatment was the result of an unconstitutional policy statement, ordinance,

regulation or decision officially adopted and promulgated by the County's officers. *Id.* at 690.  A

plaintiff need not "identify an express rule or regulation" to establish an official policy or custom.

*Patterson v. Cnty. of Oneida, New York*, 375 F.3d 206, 226 (2d Cir. 2004).  Rather, a plaintiff

may establish an official policy or custom by demonstrating that: (1) a discriminatory practice of

municipal officials was "was so persistent or widespread" that it constituted a custom; (2) a

discriminatory practice by subordinate employees was "so manifest as to imply the constructive

acquiescence of senior policy-making officials"; (3) the municipality so consistently "fail[ed]

properly to investigate and address allegations of sexual harassment [that the] conduct be[came]

an accepted custom or practice of the employer"; or (4) the municipality's failure to train its

employees demonstrated "a deliberate indifference to the constitutional rights of those within its

jurisdiction."  *Id*. (internal citations and quotations omitted).  *See also Sanchez-Vazquez*, 2012

WL 2856824 at *5; *Sulehria v. City of New York*, 670 F. Supp. 2d 288, 320 (S.D.N.Y. 2009).

       In her opposing papers, Piston does not address defendants' argument that the

allegations in her complaint are inadequate to support liability against the County.  Instead,

Piston focuses on whether factual issues exist as to whether she was subjected to same-sex

harassment and whether her complaints raised an issue of public concern.  (*See* Docket # 43-1 at

31-32).  Her Equal Protection cause of action alleges merely that the sexual harassment she

suffered "amounted to a municipal policy due to the failure of the County to take any remedial

action whatsoever" – an allegation that is belied by Piston's own admission in the same pleading

that Rivera removed Quinlivan as her supervisor after she complained to House.  (Docket # 14 at

¶¶ 29, 68).  Piston's First Amendment claim fails altogether to allege any facts regarding a policy or custom related to retaliation.  (*See id.* at ¶¶ 73-77).

Considering Piston's lack of opposition to defendants' argument and the contradictory nature of her allegations in her complaint regarding the County's response to her complaints about Quinlivan, I find that Piston has failed to plausibly allege that the acts about which she complained were carried out pursuant to an official municipal policy or custom.  *Plair v. City of New York*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (dismissing *Monell* claim lacking factual details establishing liability and containing "boilerplate allegations of unconstitutional policies and practices"); *Santiago v. City of New York*, 2009 WL 2734667, *3 (E.D.N.Y. 2009) (dismissing boilerplate *Monell* claim under *Twombly/Iqbal* plausibility standard).  Accordingly, I grant defendants' motion to dismiss Piston's Section 1983 claims against the County.

## B. <u>First Amendment Retaliation Claim</u>

Finally, I turn to Piston's First Amendment retaliation claim against Quinlivan.[20] "Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

---

[20] Although the parties' briefs address an equal protection claim against Quinlivan, such a claim is not pled in the complaint.  Specifically, the fifth cause of action – which is captioned, "Claims Under 42 U.S.C. § 1983[,] Discrimination in Violation of the Equal Protection Clause" – refers to "defendant" in the singular.  (Docket # 14 at ¶¶ 68, 71).  That the County, and not Quinlivan, is the defendant against which this claim is premised is evidenced by the allegation that the defendant deprived Piston of her constitutional rights under the Equal Protection Clause by "engaging in the conduct described above . . . , in particular, the sexual harassment suffered by [p]laintiff at the hands of her supervisor . . . [which] amounted to a municipal policy due to the failure of the County to take any remedial action whatsoever."  (*Id*. at ¶ 68).

If the plaintiff did not speak on a matter of public concern, no First Amendment claim may be asserted based on the employer's response to the speech. *Garcetti v. Ceballos*, 547 U.S. at 418; *see also Ross v. Breslin*, 2012 WL 3892396, *3 (2d Cir. 2012).

Whether the employee's speech addresses a matter of public concern is a question of law; "[t]he heart of the matter is whether the employee's speech 'was calculated to redress personal grievances or whether it had a broader public purpose.'" *Ruotolo v. City of New York*, 514 F.3d at 189 (quoting *Lewis v. Cohen*, 165 F.3d 154, 163-64 (2d Cir. 1999)). A public employee's complaints about gender or race discrimination against him or her in the workplace "do not address matters of public concern if they relate only to a personal employment grievance." *Kantha v. Blue*, 262 F. Supp. 2d 90, 101 (S.D.N.Y. 2003) (collecting cases). By contrast, complaints that are "part of an overall effort . . . to correct allegedly unlawful practices or bring them to public attention" are protected under the First Amendment, *id.*, although a personal grievance does not become "a matter of public concern by invoking a supposed popular interest in the way public institutions are run," *Ruotolo*, 514 F.3d at 190 (quoting *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007)).

In this case, Piston has failed to allege facts that plausibly suggest that Quinlivan retaliated against her for exercising her First Amendment rights. Although Piston alleges in her memorandum that her complaint "raised an issue of public concern in criticizing the treatment of women who work for Monroe County," (Docket # 43-1 at 32), Piston's complaint contains no allegations suggesting that her complaints concerned anything other than grievances about her own employment conditions. (*See* Docket # 14). Moreover, with respect to any claim against Quinlivan arising from the decision not to rehire Piston, her complaint fails to allege that

Quinlivan was involved in that decision.  Accordingly, I grant Quinlivan's motion for judgment on the pleadings as to Piston's First Amendment claim.[21]

### C.  Punitive Damages Claim Against Quinlivan

Because no claims remain against Quinlivan, Piston's final cause of action for punitive damages against her must be dismissed.

## CONCLUSION

For the reasons discussed above, defendants' motion for judgment on the pleadings and for summary judgment **(Docket # 41)** is **GRANTED in PART** and **DENIED in PART**.  Specifically, Piston may proceed on her Title VII claims against the County for hostile work environment, failure to train and retaliation related to her claim that the County failed to rehire her after her termination.  All other claims are dismissed.  The parties are directed to appear for a trial date status conference before the undersigned on **October 25, 2012**, at **11:30 a.m.**

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
          September ___27___, 2012

---

[21] Defendants' brief is unclear as to whether Quinlivan also moves for summary judgment on this claim.  If it may properly be read to seek judgment on this claim under Fed. R. Civ. P. 56, I agree that Piston's speech did not address a "matter of public concern," *see Garcetti*, 547 U.S. at 418, and that Piston has not raised a triable issue of fact that Quinlivan was involved in the decision not to rehire her.